UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,   :
         Plaintiff,    :
                    :
      v.               :    No. 3:86-cv-252 (EBB)
                    :
STATE OF CONNECTICUT, et al., :
         Defendants.   :

**Ruling on Case Management Plan Compliance**

Before the Court is the Special Master's Report to the Court No. 52: Case Management [Doc. No. 1062] ("Report"), submitted October 29, 2003,[1] Defendants' objections to the Report, the United States' response to Defendants' objections and Defendants' reply to the United States response.[2]

The Report is submitted pursuant to FED.R.CIV.P. 53 and the July 30, 1997 Order of Reference [Doc. No. 152] and includes the evidentiary record of the August 4-6, 2003 hearing on Case Management Plan compliance at Southbury Training School ("STS") before the Special Master, and the Master's findings of fact and conclusions of law.

The Report finds Defendants in non-compliance with Goal 1 of the Case Management Plan ("Plan") (Recruit and Maintain a Full

---

[1] Report to the Court No. 52: Case Management consists of eight volumes: the evidentiary record from the August 4-6, 2003 hearing on Case Management Plan compliance is contained in volumes one through seven, and the Special Master's Report is Volume Eight.

[2] Defendants' Objections to the Special Master's Report to the Court No. 52: Case Management [Doc. No. 1082]; United States' Response to Defendants' Objections to the Special Master's Report to the Court Number 52: Case Management [Doc. No. 1296]; Defendants' Reply to the United States' Response to Defendants' Objections to Special Master Report to the Court No. 52: Case Management [Doc. No. 1096].

Complement of Competent Case Managers) in that the Special Master found Defendants did not base a reduction in the case manager complement on client need and current case manager responsibilities as determined by the Director of Case Management, as required by the Plan.[3]   As a remedy, the Master recommends that Defendants immediately return the number of full-time case managers to the pre-layoff complement of 21.   The Report finds Defendants in compliance with the person-centered planning requirements of Goal 2 of the Plan (Provide STS Residents with Case Management Services that are Responsive to their Needs and Desires) with respect to the approximately 100 STS residents who had received the benefit of the Overall Plan of Service ("OPS") Initiative/Habilitation Initiative by the fall of 2003, which was Defendants' chosen method for improving person-centered planning.   The Master recommends that Defendants devote sufficient resources to expedite the rollout of the OPS Initiative before Defendants' target date of October 2005.

**Background**

The background of this action has been extensively set forth

---

[3]The Case Management Plan has six goals, five of which were released from active judicial oversight in 2002 (Goals 1, 3-6).  After the layoff of three case managers in the winter of 2002-2003, compliance with Goal 1 was reconsidered by the Master.
Goal 1: Recruit and Maintain a Full Complement of Case Managers
Goal 2: Provide STS Residents with Case Management Services that are Responsive to their Needs and Desires
Goal 3: Improve Mechanisms to Correct Identified Problems/Issues that are Unresolved at the Interdisciplinary Team Level
Goal 4: Improve Case Manager Abilities to Access and Evaluate Services and Supports that Meet Individuals' Needs
Goal 5: Provide Organizational Support for Case Managers
Goal 6: Evaluate Implementation of the Plan

in prior rulings, and is noted briefly here only to give context to the case management compliance issues.

On September 11, 1985, following an investigation by the United States Department of Justice under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. §1997 et seq., Plaintiff brought this action against the State of Connecticut, the Governor, the Commissioner of the Department of Mental Retardation ("DMR"), and the Director of STS, pursuant to CRIPA. In lieu of litigation, the United States and various Connecticut officials entered into a Consent Decree which this Court so ordered on December 22, 1986.

The Consent Decree required the Defendants to submit an Implementation Plan, which was adopted by the Court on July 21, 1988.  The Implementation Plan described Case Management as "the department's most fundamental and individualized quality assurance mechanism."[4]  It provided that: "Each Southbury resident will have a specific individual assigned as his/her case manager at a ratio not to exceed 1:40."[5]  Case managers were to perform 15 specified functions.[6]  The Implementation Plan noted that, as of August 1986, the ratio of case managers to Southbury

---

[4]Implementation Plan at 26.

[5]Id.

[6]Id.  These 15 functions were subsequently adopted as Court Requirement 45 of the Remedial Plan.

residents was 1:60-1:70.[7]

Eight years later, Defendants were found in contempt of the Consent Decree and the Implementation Plan ("the remedial orders"). United States v. State of Connecticut, 931 F. Supp. 974 (D. Conn. 1996), appeal dismissed, 1997 U.S. App. LEXIS 21006 (2d Cir., June 13, 1997). The Special Master was appointed by the Court, and a Remedial Plan [Doc. No. 188] was developed by the Special Master and adopted by the Court on April 21, 1998 with the parties' consent. The Remedial Plan required Defendants to develop and submit a Case Management Plan for approval by the Court within six months of the approval of the Remedial Plan. Defendants timely submitted a draft plan in October of 1998, which was later withdrawn.[8] Defendants subsequently submitted two more proposed draft plans, the second of which was submitted as Defendants' formal proposed Case Management Plan on April 8, 1999.[9] The Special Master subsequently submitted his Report to the Court No. 10: Defendants' Case Management Plan [Doc. No. 291] approving Defendants' April 1999 Plan. The Plan was approved and so ordered by this Court on April 28, 1999 [Doc. No. 292].

The Case Management Plan has six goals, five of which were released from active judicial oversight in 2002 (Goals 1, 3-6).

---

[7]Id.

[8]See the Court's Order dated April 28, 1999 [Doc. No. 292] Approving Report to the Court No. 10: Defendants' Case Management Plan at 1.

[9]Id. at 2.

Each goal is accompanied by objectives and action items. Goal 1 (recruit and maintain a full complement of competent case managers), which had been found in compliance in 2002, was reconsidered by the Master during the August 2003 hearings, following the winter 2002-03 layoffs at STS during which time three case manager positions were eliminated, bringing the complement from 21 down to 18. The Special Master's authorization to reconsider Goal 1 came from the Court's Order dated February 25, 2003 [Doc. No. 915] which stated in relevant part:

> "With regard to remedial order requirements related to habilation, case management and quality assurance, the Special Master is directed, in making future compliance determinations, to consider the effect of the layoffs and to *reconsider any related prior compliance determinations in light of the layoffs*."

February 25, 2003 Order at 2-3 (emphasis added).

**Defendants' Position**

Defendants object to the Report on several grounds. With respect to the Report's findings on Goal 1, with regard to whether they were in contempt going into the hearing, they assert that, because they were found compliant with regard to Goal 1 in June of 2002, and because the Special Master was only directed to "consider the effect of the layoffs on case management compliance," the Special Master had neither the right nor the authority to unilaterally presume Defendants were no longer in compliance prior to a hearing, and then put the burden of proving compliance on Defendants.

Defendants also object to the Special Master's analysis of the Case Management Plan goals as if they were equivalent to Court Requirements under the Remedial Plan.  They assert that the Plan and the goals that it contains do not and were not meant to establish new Court Requirements.  Rather, Defendants maintain, the Case Management Plan was merely a "best practices" plan to which Defendants agreed based upon the Special Master's "suggested compromise" that the Plan would not become a Court Order – i.e., new court requirements greater than those in the Remedial Plan.

In addition, Defendants object to the Special Master's report because they maintain that Goal 1 of the Case Management Plan did not set out a specific method and standard for any change in the complement of case managers.  Because the Special Master interprets the Plan to mean that any "change in the complement (and thus, the ratio) was the responsibility of the Director of Family Support" (Kathy Haniewicz), see Report Vol. 8 at 38, 53, Defendants object because they maintain that Goal 1, Objective 3, Action Item 1 does not invest Ms. Haniewicz with either the authority or the responsibility for setting the complement (the number of approved positions that can be filled to provide services), which, they maintain, is not the same as the ratio.

Defendants also assert that the case manager-to-client ratio of 1:40 set out in the Implementation Plan and the Remedial Plan has never been changed, and they never committed to a new ratio

below 1:40.  Defendants maintain that the Case Management Plan only suggested further consideration would be given to the ratio issue.

Furthermore, Defendants argue that, "the issue for this hearing and for this Report should have been whether a complement of 18 Case Managers currently represents a 'full complement,' and whether a corresponding Case Manager-to-client ratio of approximately 1:34[10] is 'adequate.'" <u>Defendants' Objections to the Special Master's Report to the Court No. 52: Case Management</u> ("Defendants' Objections") at 16.

With regard to Goal 2 of the Case Management Plan, person-centered planning, Defendants maintain that, although person-centered planning is mandatory under the Case Management Plan, they are not mandated to implement the OPS for everyone at STS to satisfy the requirement that they provide more person-centered planning.  Defendants maintain that the OPS Initiative related to Goal 2 was a voluntary undertaking – another instance of adopting "best practices."  Defendants object to the Special Master's conclusion that Defendants have failed to satisfy the person-centered planning requirement of Goal 2 of the Case Management Plan "without making any determination that the current process or current OPSs are insufficiently person-centered to comply with Goal 2."  Defendants' Objections at 23-24.  Defendants

_____

[10]The Court is not clear as to which time period Defendants refer: there is no month reported around the time of the hearing where the ratio was 1:34. It was reported as 1:35.2 in August of 2003 and 1:33.2 in September of 2003.

note that the parties specifically agreed, and the Special Master repeatedly affirmed, that the OPS Initiative would not be the standard by which Defendants' compliance was to be judged. Defendants' Objections at 26-27. Instead, Defendants maintain, the Special Master should have examined the ways in which they did make the existing OPS process more person-centered. Defendants also object to the Report in that they find the Master's suggested time-table for full implementation of the OPS Initiative unreasonable.

**United States' Position**

The United States urges the Court "to endorse the determinations reached by the Master and to find Defendants in non-compliance with Goal 1 of the Case Management Plan and with Goal 2 of the Case Management Plan, with regard to the residents of STS who have not yet had the benefit of the OPS initiative." United States Response to Defendants' Objections to the Special Master's Report to the Court Number 52: Case Management at 4-5. The United States maintains that higher ratios harm residents at STS and that Defendants presented no evidence that planning was or had been person-centered.

**Standard of Review**

The Master's Report was submitted pursuant to FED.R.CIV.P. 53 on October 28, 2003. Rule 53 was amended on December 1, 2003. Under the Rule in effect on October 28, 2003, the Court must accept the findings of fact of a Special Master unless they are clearly

8

erroneous.  See FED.R.CIV.P. 53(e)(2) (2002).  A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948) (internal quotations omitted)).  Under the revisions in effect on December 1, 2003, a Court must decide de novo all objections to findings of fact and conclusions of law of a Special Master unless the parties stipulate that the Master's findings of fact will only be reviewed for clear error.  See FED.R.CIV.P. 53(g)(3) and (4) (2003).  The Report having been filed before the changes to Rule 53 took effect, this Court reviews the Master's findings of fact for clear error.[11]

    "A district court must give 'some deference' to a master's recommendation where the master has 'direct and extensive' knowledge about the particular circumstances of a given case.  A district court that extends some deference to the master will consider his recommendation and the factors influencing it, but will not regard the recommendation as the alpha and omega of the . . . analysis." Goodrich Corp. v. Town of Middlebury, 311 F.3d 154, 171 (2d Cir. 2002) (citation omitted) (alteration in original). "Where there are two permissible views of the evidence, the

---

[11]Even if this Court reviewed the Master's findings and conclusions de novo under the revised standard in Rule 53, it would reach the same result.

factfinder's choice between them cannot be clearly erroneous."
Anderson, 470 U.S. at 574.

**Discussion**

This Court commends the Special Master for the time and care
with which he undertook a review of Defendants' compliance with the
Case Management Plan.  In this instance, however, there are "two
permissible views of the evidence."  Anderson, 470 U.S. at 574.
Having reviewed the Master's findings of fact for clear error, and
giving "some deference" to the Master's recommendations because the
Master has "direct and extensive knowledge about the particular
circumstances of [this] case," Goodrich, 311 F.3d at 171, this
Court holds that, on review of the entire evidence, the Master's
findings of fact that Defendants are non-compliant with regard to
Goal 1 and Goal 2 of the Case Management Plan are clearly
erroneous.  For the reasons set out below, this Court finds
Defendants are in compliance with Goal 1 and Goal 2 of the Case
Management Plan, and those Goals are hereby RELEASED from active
judicial oversight.

**Enforceability of the Case Management Plan**

At the time the Remedial Plan was developed, more than half of
the case managers at STS had resigned within a two-month time
period.  The Court was concerned with this loss of experienced
staff and, stemming from this concern, the Remedial Plan required
that Defendants submit a plan on case management within six months

10

of the approval of the Remedial Plan that would include:

a) consideration of the loss of case managers in the year leading up to the Remedial Plan;

b) analysis of the roles and work of case managers;

c) consideration of the appropriateness of the current case manager-to-client ratio and any needed changes;

d) any other recommendations regarding case management.

The Remedial Plan stated that, upon submission of a case management plan acceptable to the Special Master, Defendants shall implement such plan.  An initial draft plan was submitted in October of 1998.  This plan was withdrawn, and subsequently, two other draft plans were submitted, with a final plan submitted in April of 1999 as Defendants' proposed final plan.  Defendants represented to the Special Master that this final plan was a "best practices" plan designed to establish standards exceeding those required in the Court orders in this case, and that Defendants did not want to be bound by a Court order to such "best practices" above and beyond what the Implementation Plan and Remedial Plan required. Defendants now object to the Special Master's findings that any alleged non-compliance with Case Management Plan goals shall be analyzed as if the goals were equivalent to Court Requirements in the Remedial Plan, where non-compliance equals contempt.  The Court notes that, at the time the Case Management Plan was submitted, the Master specifically suggested a compromise, whereby the goals would

11

not be equivalent to Court Requirements, in his letter to Defendants and in his letter to the Court recommending the Case Management Plan. See Vol. 4 at 621-22, 624-25, Defendants' Hearing Exh. 10 [Memo to Court from Special Master re: Case Management Plan, March 9, 1999; Memo to Jim Welsh/Mark Masling from Special Master re: Case Management Plan]. This Court approved Defendants' Case Management Plan on April 28, 1999, and ordered that Defendants implement the Plan. The Court notes that the Case Management Plan is judicially enforceable to the extent Defendants have committed to the implementation of its "best practices" and this Court has so ordered the Defendants to do so. However, this Court does not want to lose sight of the fact that its original concerns regarding case management stemmed from the staff exodus in the two months preceding the approval of the Remedial Plan. It would be a great disincentive to Defendants for this Court to congratulate progress by continually raising the threshold at which Defendants are found compliant. There will always be room for improvement; what is most important is that, even as Defendants meet the minimum standards required in the Court orders, Defendants demonstrate a self-perpetuating system of constant improvement beyond these minimum standards.[12] In the area of case management, this Court believes

---

[12]See Vol. 2 at 262-63 (testimony of Kathy Haniewicz): "The court requirements have to be measurable, have to be based on data; we have to be able to prove it . . . . The case management plan was conceived far apart from those court requirements. That plan was undertaken at a time of change, chaos, duress, you know, guidance for the future. It was developed - a lot of it was developed with my vision and my direction to where do I want to see

Defendants have done so.

**Goal 1 of the Case Management Plan**

**Burden of Proof**

Defendants maintain that, with regard to Goal 1, "the issue for this hearing and for this Report should have been whether a complement of 18 Case Managers currently represents a 'full complement,' and whether a corresponding Case Manager-to-client ratio of approximately 1:34 is 'adequate.' Defendants' Objections at 16.

Defendants admit they "must implement the Case Management Plan they developed" even as they object to the Plan's Goals being equated with the Remedial Plan Court Requirements. See Defendants' Objections at 7.  However, Defendants assert that this Court only directed the Special Master to "consider the effect of the layoffs on case management compliance" and therefore, the "Special Master had neither the right nor the authority to unilaterally determine or presume that Defendants were no longer in compliance with Goal 1 prior to a hearing . . . [and that] Defendants did not have the burden of 'demonstrat[ing] that they had purged themselves of contempt through compliance' with Goal 1."  Defendants' Objection at 7-8 (quoting Report Vol. 8 at 19).   This Court's Order of

---

this group of people . . .; am I satisfied, you know, is Southbury meeting the minimum acceptable standards . . . . I am not – will not tolerate, accept today minimal acceptable standards from anybody that works for me, you can ask anybody; and I have set for my staff or for anybody else the standards that far exceed that."

February 25, 2003 specifically directed the Special Master to "consider the effect of the layoffs and to *reconsider any related prior compliance determinations* in light of the layoffs" (emphasis added).  Thus, the Special Master had both the right and the authority to reconsider the issue of compliance with Goal 1.  It is not clear from the Master's Report that, as Defendants assert, he found them in contempt before the hearing.  See Report Vol. 8 at 38 ("Defendants remain in contempt"); id. at 19 ("during the hearing Defendants sought to demonstrate that they had purged themselves of contempt through compliance with Goals 1 and 2 of the Plan").

**The Case Management Plan does not set out a mandatory process for changing the case manager complement**

The Master finds that the Case Management Plan provided for a specific method and standard for any change in the complement of case managers.  This specific method, the Special Master finds, detailed in Goal 1, Objective 3, Action Item 1,[13] is that

---

[13]Case Management *Goal #1 Recruit and Maintain a full complement of competent Case Managers*

Objective 3: Case Manager and Supervision Ratios will be Adequate

| Action Items | Person Responsible | Deadline |
|---|---|---|
| 1. Analyze all caseloads based on individuals' needs and Case Managers' current responsibilities.  Adjust caseload sizes as necessary. | Director of Family Supports | 4/1/99, ongoing |
| 2. Establish and maintain adequate Case Management and supervision ratios. | Director of Family Supports Director of Residential Programs | Ongoing |
| 3. Revise current data collection system based on desired outcomes of case management functions. | Director of Family Supports Director of Residential Programs | Ongoing |

Case Management Plan at 12.

adjustments in staffing must be based on "client need" and case managers' "current responsibilities."  The Master finds that any change in the complement was the responsibility of the Director of Family Support (Kathy Haniewicz).  See Report Vol. 8 at 38, 53. The Master therefore finds Defendants not in compliance for failing to comply with "the unambiguous mandatory process for changing the case management complement (and, therefore, ratio)" because Defendants arbitrarily reduced the complement of case managers from 21 to 18.  Report Vol. 8 at 38 (emphasis in original).

Kathy Haniewicz wrote each of the Goals, Objectives and Action Items of the Case Management Plan, and testified at the Case Management Hearing that the wording of Goal 1, Objective 3, Action Item 1 enabled her, as the Case Management Director/Director of Family Supports, to *adjust caseloads* between and among case managers based upon individuals' needs and the case manager's current responsibilities.  Vol. 3 at 71-72.  Defendants maintain that authority over decisions regarding overall staffing, including the complement of case managers, is vested in the State Department of Mental Retardation ("DMR") and STS administrators, not the Director of Family Supports.

At the hearing, Haniewicz testified as follows: "[T]here were continued responsibilities of case managers at Southbury and to look at that relative to caseloads and the number of people and the job function and to be able to manage that, to identify key

15

variables, the relationships with people, the type of work, the interactions with ID team, the resources that people are coordinating, and to make sure that there was a systematic way to go about looking at how you assign cases and what's reasonable and adequate staffing levels. And that was at Goal 1 Objective 3 of the [C]ase [M]anagement [P]lan." Vol. 3 at 71-72.

Goal 1, Objective 3, Action Item 1 states "Analyze all caseloads based on individuals' needs and Case Managers' current responsibilities [and] [a]djust caseload sizes as necessary." In examining all the evidence, this Court finds that, rather than setting out a mandatory process for changing the complement of case managers, this Action Item, as written by Haniewicz, and as explained by Haniewicz at the Case Management Hearing, contemplated such an analysis for the process of assigning cases to the individual case managers.

### Defendants did not bind themselves to maintaining a ratio below the 1:40 mandated by the Remedial Plan

Although the Master's Report bases a finding of non-compliance with regard to Goal 1 on Defendants' failure to follow a process, Defendants object that the Master also finds that Defendants committed themselves to a lower ratio because Defendants themselves chose to maintain a ratio between 1:25 and 1:30 for many years, and in statements to the Court, papers filed with the Special Master, and testimony from Haniewicz, committed to maintain the 1:25 to 1:30 ratio. "Having reviewed the record carefully, the master

16

determines that professional opinion is less helpful than the dispositive guidance provided by Defendants' 1:25 to 1:30 ratio designated in the Case Management Plan[14] and the Defendants' representations and commitments around the adoption of that plan and in the four years since then." Report <u>Vol. 8</u> at 36. Defendants assert that they never committed to a case manager-to-client ratio below the Court-mandated ratio of 1:40.

While the Special Master is correct that the Remedial Plan language signaled a possible change in the ratio, noting that Court Requirement 28 "may be affected" by the Case Management Plan, ultimately CR 28 was not affected by the Plan and no change was made in the mandated ratio. <u>See</u> Remedial Plan at 213.[15] The language in CR 28 reflected the Remedial Plan requirement that the Case Management Plan to be submitted within six months of the

---

[14]This statement is erroneous; such a ratio was not designated in the Case Management Plan.

[15]

**Court Requirement 28**
**Case Management Ratio**

| 28.  Case Management Ratio (formerly 30) | Maintain case manager ratio of minimum 1:40. IP V, p. 28. |

**Compliance Provisions**

Note: This requirement may be affected by the Case Management Plan under Part 4 of the Remedial Plan.

| 1. Desired Outcome | A 1:40 case manager ratio |
| 2. Threshold | Full |
| 3. Evaluation Criteria | 1. Is there an overall 1:40 case manager ratio? |
| 4. Review Methods | CAMRIS data (staff and clients). Interviews and observations. |

Remedial Plan at 213.

approval of the Remedial Plan include, <u>inter</u> <u>alia</u>, "consideration of the appropriateness of the current Case Manager to client ratio and any needed changes."  Remedial Plan at 24.  Although the initial October 1998 draft plan "consider[ed] the appropriateness" of the 1:40 ratio, this Plan was withdrawn.[16]  Evidence of the withdrawal was presented in Defendants' Hearing Exh. 10.  <u>See</u> <u>Vol. 4</u> 621-25 (memoranda noting October 1998 draft plan withdrawn).[17] This Court does not bind Defendants to statements in the withdrawn draft plan.  The final Case Management Plan did not consider the appropriateness of the 1:40 ratio explicitly, or in the same way as the October 1998 draft, and yet it was approved by the Master and this Court.

---

[16]In a section entitled "Appropriateness of the Current Case Manager to Client Ratio" Defendants stated that "At the present time, the current case manager to resident ratio is 1:27, with a range of from 1:20 to 1:38.  When the case manager and QRMP roles were combined, statewide, the expectation was that caseload size would be adjusted based on increased responsibility, with a range in the ratios of between 1:25 and 1:30.  The literature speaks of acceptable ratios of between 1:25 and 1:30 when providing active, intensive case management services."  <u>Vol. 7</u> at 1706 (Defendants' <u>Case Management Report</u> submitted in October of 1998 (withdrawn)).

The Court notes Defendants' argument that the model of Case Management at STS is a traditional one of coordinating supports and services, not active or intensive case management as would be found in a community setting.  The Special Master finds the distinction between intensive case management and traditional case management "unpersuasive."  <u>See</u> Report <u>Vol. 8</u> at 43 n.122.  However, the Special Master, in his Report, states, quoting Haniewicz, "case managers at STS have a service coordination role. . . ."  <u>Vol. 8</u> at 7.

Case manager Virginia McDermott stated in her deposition that QRMP case managers "oversee" the provision of services to residents, making sure, <u>inter</u> <u>alia</u>, that "active treatment" is provided, that meetings are held and that there is compliance with the ICF regulations.  <u>Vol. 5</u> at 727.  The Court makes no findings on this issue.

[17]The Special Master finds that, although Ms. Haniewicz testified at the hearing that the state withdrew "it," she did not clarify whether she meant the plan or the commitments on ratios.  The Master finds that "No other evidence of the withdrawal was submitted."  <u>See</u> Report <u>Vol. 8</u> at 42 n.122.  This finding is clearly erroneous.

18

There was no evidence presented that a ratio above 1:30 but at or below 1:40 has led to an inability for case managers to complete the 15 case manager functions mandated by CR 45.   This Court ordered the parties to supplement the evidence on Case Management compliance on September 8, 2005 [Doc. No. 1305], and Defendants reported that, as of August 31, 2005, there were approximately 568 residents at STS and a complement of 18 case managers.   A case manager complement of 18 has been maintained since January of 2004. Thus, the ratio as of August 31, 2005 was approximately 1:31.5.[18] In August of 1986, this ratio was between 1:60 and 1:70.

### Defendants were not in violation of the 1:40 ratio at the time of the Case Management Hearing in August of 2003

The Special Master also finds that the Defendants were non-compliant regarding Goal 1 at the time of the hearing because while the complement was 18 (the number of positions authorized and funded), two case managers had recently transferred to other regional positions and one case manager was out on maternity leave, leaving only 15 case managers for the 605 STS residents.   The Special Master finds that the ratio at the time of the hearing, therefore, was 1:40.33.[19]   The Special Master noted that the 15 did

---

[18]Defendants have reported a ratio below 1:40 for each month beginning in August of 2003 and continuing through August of 2005: the complement has remained at 18 since March 2004, and largely as a result of declining population, the ratio has been below 1:33 since March of 2004.

[19]This is the same ratio self-reported by Defendants in their supplemental evidence on compliance with Case Management submitted pursuant to this Court's Order of September 8, 2005.

not include Assistant Director John Baker or Quality Assurance
staff member Karen Ostrum, who were "pitching in" although they had
other full-time duties.  See Report Vol. 8 at 47 n.131.  The
Special Master finds that Defendants sought to "avoid the
implications of exceeding the 1:40 ratio by suggesting the
inclusion of the Case Management Assistant Director in the ratio"
although their previous reporting and ratio calculations never
included the Assistant Director.  See id. at n.132.  The Court
finds the Master's conclusions to be clear error.

While it is true that Defendants had not included Assistant
Case Management Director Baker in past ratio calculations, and that
Defendants' self reporting at the time, and in supplemental
evidence submitted in October of 2005, stated that there were 15
case managers and a resident census of 605 in July of 2003, Baker
testified at the hearing that he was carrying an actual caseload of
33 STS residents which, it seems, was an effort on the part of
Defendants to ameliorate a temporary shortfall right around the
time of the hearing due to the two recent case manager resignations
and the maternity leave of another.  See Vol. I at 33-36.  Since
Baker had a caseload of 33 residents at the time of the hearing,
the ratio at the time of the hearing including his services would
have been 1:37.81.  Additionally, testimony established that Karen
Ostrum assumed a caseload in July of 2003 and was expected to
continue with that caseload until the case manager on maternity

20

leave resumed her duties.  <u>Vol. I</u> at 33-34.  Thus, the ratio at the time of the hearing, interim efforts included, was 1:35.59 (605 residents divided by 17 staff with caseloads, including Baker and Ostrum).  Furthermore, Defendants' supplemental evidence, submitted in October of 2005, shows a ratio of 1:35.2 for August 2003, and, since July 2003, the ratio has never again been above 1:40.  Thus, even if Baker and Ostrum were not figured into the analysis, Defendants only exceeded the 1:40 ratio for one month, July 2003, and immediately took steps to bring themselves in conformity with the Remedial Plan requirements.

**Goal 2 of the Case Management Plan**

In the Special Master's Report to the Court he finds that the "OPS Initiative" was Defendants' chosen means to implement the person-centered planning requirement of the Case Management Plan. It is only one way to implement the goal of person-centered planning, but, the Special Master asserts, it seems to have been the way chosen by Defendants, despite their protestations otherwise.  He thus finds Defendants in compliance with regard to Goal 2 of the Case Management Plan – person-centered planning – to the extent that they provided person-centered planning to the 100 individuals who had received their OPS review under the OPS Initiative at the time of his report in late 2003.

Defendants maintain that although person-centered planning is mandatory under the Case Management Plan, they are not mandated to

implement the OPS for everyone at STS to satisfy the requirement that they provide person-centered planning.  Defendants argue, as they do with regard to Goal 1, that the OPS Initiative related to Goal 2 was a voluntary undertaking – another instance of adopting "best practices."  Defendants object to the Special Master's conclusion that Defendants have failed to satisfy the person-centered planning requirement of Goal 2 of the Case Management Plan "without making any determination that the current process or current OPSs are insufficiently person-centered to comply with Goal 2."  Defendants' Objections at 23-24.

Defendants maintain that the OPS process has been enhanced since 1999 using means other than the OPS Initiative to make it more person-focused.  Furthermore, Defendants note that the parties specifically agreed, and the Special Master repeatedly affirmed, that the OPS Initiative would not be the standard by which Defendants' compliance was to be judged.  Defendants' Objections at 26-27.  Instead, Defendants argue, the Special Master should have examined the ways in which they did make the existing OPS process more person-centered.

Defendants note that substantial evidence was presented at the hearing to show that the "old" existing OPS process is person-focused.  They maintain that each of the three case managers called by the United States testified that case management was being provided in a person-centered fashion regardless of whether

22

individuals had yet benefitted from the new OPS Initiative. <u>See</u> Defendants' Objections at 28-29, citing to testimony of McDermott, Thomen and Poe.

Defendants further object that the timetable recommended by the Special Master (completion of all the new OPSs by October 2005) is arbitrary and unreasonable because the process is time-intensive, individualized and in some cases, where an individual has severe and profound disabilities and cannot communicate and fully participate in the process, "visions" for their lives created by proxies may be inappropriate.

The OPS Initiative/Habilitation Initiative is designed to move from "deficit driven plans to planning from peoples' strength and preferences, ... to a person-focused model." Defendants began the planning and implementation of the OPS Initiative in December 2002. In each subsequent quarterly report they have documented continuing and sustained progress in assuring residents receive person-centered planning. Approximately 100 individuals had a personal assessment and the modified OPS completed by the time the Master issued his Report in late 2003. Defendants' latest Quarterly Compliance Report states that as of June 30, 2005, 465 of the approximately 572 residents have had the new OPS written, approximately 81.3%. Defendants' response to the Court's Order to supplement evidence of case management compliance states that as of August 31, 2005, 508 of the 568 residents had both the Personal

Assessment and modified OPS completed – an overall rate of 89.4%. Thus, Defendants have been providing more person-centered planning in a way determined by them to be a "best practice" since this process began in December of 2002. See Defendants' Supplemental Evidence Supporting Compliance with All Remaining Court Requirements Related to Case Management Issues [Doc. No. 1316], Habilitation Initiative Updates 10/29/03 - 8/81/05. The Court commends Defendants for their efforts to go beyond the requirements of the Remedial Plan.

As only 60 residents had yet to benefit from the OPS Initiative by August 31, 2005, and as the current target date for compliance with all Court orders is February of 2006, the Court expects that by that date each resident shall have had both the Personal Assessment and modified OPS completed. Thus, the Court finds Defendants in compliance with Goal 2 of the Case Management Plan, and it is hereby RELEASED from active judicial oversight.

**Conclusion**

Defendants report the current census as of August 31, 2005 at 568 residents. Therefore, with a complement of 18, maintained since late 2003, the current ratio of case managers to clients would be approximately 1:31.55, well within the requirements of the Remedial Plan. The ratio has been below 1:40 since August 2003. Thus, this Court finds Defendants have sustained compliance for more than one year, and Goal 1 of the Case Management Plan is

hereby RELEASED from active judicial oversight.

Additionally, as of August 31, 2005, 89.4% of the residents at STS had both the Personal Assessment and the modified OPS completed under the OPS Initiative.  This implementation has been sustained since December of 2002 and thus, compliance having been sustained for more than one year, Goal 2 is hereby RELEASED from active judicial oversight.

      SO ORDERED.

      _____
      ELLEN BREE BURNS, SENIOR JUDGE
      UNITED STATES DISTRICT COURT

Dated at New Haven, CT, this ____ day of November, 2005.