UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,      :
            Plaintiff,         :
                               :
        v.                     :      No. 3:86CV252(EBB)
                               :
STATE OF CONNECTICUT, et al., :
            Defendants.        :

### Ruling on Communication Services Compliance

Before the Court is the Special Master's Report to the Court
No. 57: Communication Services Vol. 4 [Doc. No. 1244] ("Report"),
filed April 6, 2005,[1] Defendants' objections to the Report, the
United States' responses to Defendants' objections and Defendants'
reply to the second United States response.[2]

The Report is submitted pursuant to FED.R.CIV.P. 53 and the
July 30, 1997 Order of Reference [Doc. No. 152] and includes the
evidentiary record of the hearings on Communication Services at
Southbury Training School ("STS") held October 8-10, 2003, October
16-17, 2003, and November 12, 2003 before the Special Master, and
the Master's findings of fact and conclusions of law.

---

[1] Report to the Court No. 57: Communication Services consists of four
volumes: Volumes One through Three contain the evidentiary record from the
hearings on Communication Services held October 8-10, 2003, October 16-17,
2003, and November 12, 2003, including hearing transcripts and exhibits, and
Volume Four is the Special Master's Report and recommendations to the Court.

[2] Defendants' Objections to the Special Master's Report to the Court No.
57: Communication Services [Doc. No. 1260]; United States' Response to
Defendants' Objections to the Special Master's Report to the Court Number 57:
Communication Services [Doc. No. 1261]; United States' Response to Defendants'
Objections to the Special Master's Report to the Court No. 57 and Court's
Order Dated November 23, 2005 [Doc. No. 1372]; Defendants' Reply to the United
States' Response to Defendants' Objections to the Special Master's Report to
the Court No. 57 and Court's Order Dated November 23, 2005 [Doc. No. 1384].

The Report finds Defendants in non-compliance with the Court Requirements ("CRs") pertaining to the Communication Services aspect of Habilitation in that the Special Master determined that Defendants have not provided "minimally adequate habilitation" in the area of communications in two respects: 1) Defendants do not have a formal fidelity mechanism to ensure program implementation, required, the Special Master finds, under professional standards, and 2) Defendants must double the professional speech-language pathology staff to meet "minimal standards." See Report at 2.  As a remedy, the Master recommends this Court enter an order requiring Defendants to establish a formal fidelity mechanism, hire an additional three professional speech-language staff (with a subsequent needs assessment to be undertaken by the Master) and submit a written plan for achievement of compliance.[3]  The Special Master's findings are general; he does not make specific findings of non-compliance that relate to each of the CRs pertaining to

---

[3]The Master's Report recommends an order be entered:
"1) Requiring that a fidelity mechanism be established at STS to ensure that the Communications Services aspects of Habilitation programs are implemented professionally and administered reliably, and that written programs are, in fact, implemented in accordance with professional speech/language standards[;]
2) Requiring additional professional speech/language professional staff, adding at least three such staff to enable the service improvements described earlier.[A]   These additional staff should be added now, with a full needs assessment regarding staffing needs to be undertaken thereafter by the master[;] [and]
3) Requiring Defendants to immediately submit a written plan for achievement of compliance with the above mandates within twenty-five (25) days, said plan to be subject to review, approval and modification by the master." Report at 29.
[A]The Master's suggested service improvements include: 1) an increased presence of SLPs in day programs and residences; 2) a more active role for SLPs in the resident's programs and COPS guidelines; 3) an increased number of teaching strategies for residents; and 4) more active monitoring of programs. Report at 3.

Communication Services – CRs 27, 43, 44 and 52.

**Background**

The background of this action has been extensively set forth in prior rulings, and is noted briefly here only to give context to the Communication Services compliance issues.

On September 11, 1985, following an investigation by the United States Department of Justice under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. §1997 et seq., Plaintiff brought this action against the State of Connecticut, the Governor, the Commissioner of the Department of Mental Retardation ("DMR"), and the Director of STS, pursuant to CRIPA. In lieu of litigation, the United States and various Connecticut officials entered into a Consent Decree so ordered by this Court on December 22, 1986.

The Consent Decree required the Defendants to submit an Implementation Plan, which was adopted by the Court on July 21, 1988.  The Implementation Plan refers to specialty medical and therapeutic services, including, inter alia, "speech pathology" and notes the following tasks and timetables: "Recruit to fill available PT/OT speech positions or convert positions to contracts to purchase services ... continuous recruitment; Establish six (6) scholarships through STS Foundation and Home and School Association to support OT/PT/Speech professional training in exchange for commitment to work at STS ...

completed." Implementation Plan at 39. The Implementation Plan noted that as of May 1987, "contracts with private providers in the disciplines of occupational therapy, physical therapy and speech pathology total approximately 40 hours of service per week." Id. There are no other references to speech pathology in the Implementation Plan.

Eight years after the Court adopted the Implementation Plan, Defendants were found in contempt of the Consent Decree and the Implementation Plan ("the remedial orders"). United States v. State of Connecticut, 931 F. Supp. 974 (D. Conn. 1996), appeal dismissed, 1997 U.S. App. LEXIS 21006 (2d Cir. June 13, 1997). The Special Master was appointed by the Court, and a Remedial Plan [Doc. No. 188] was developed by the Special Master with the parties' consent and adopted by the Court on April 21, 1998. The Remedial Plan explicitly refers to Speech Therapy only once, in Court Requirement (CR) 27, which essentially adopts the language from the Implementation Plan with regard to recruitment of Occupational Therapy/Physical Therapy and Speech positions.[4] The

---

[4]

**Court Requirement 27 Occupational, Physical and Speech Therapy**

| 27. Occupational, Physical and Speech Therapy (formerly 29) | Recruit to fill available OT/PT and speech positions or convert positions to contracts to purchase services. IP VI, p. 39. Seek innovative methods of recruiting staff and arranging contracted therapy services. IP VI, p. 40. |
|---|---|

**Compliance Provisions**

| 1. Desired Outcome | All OT, PT and Speech positions will be filled in a timely fashion in order to ensure an appropriate level of therapy for residents. |
|---|---|
| 2. Threshold | Full |
| 3. Evaluation Criteria | 1. Are all contract and state therapy positions filled? 2. Is recruitment ongoing? 3. Is there a list of potential applicants on file? |

desired outcome of that CR is that "positions will be filled in a timely fashion in order to ensure an appropriate level of therapy for residents."  Remedial Plan at 212.  The Special Master found that Habilitation encompassed Communication Services and it was determined that a review of Habilitation would encompass speech/communications services under CRs 43, 44 and 52.[5]   See

| 4. Review Methods | List of available (funded) vacant therapy positions and list of filled positions.<br>Conversion of contract and state part-time hours into FTEs.<br>Interviews and observations. |
|---|---|

Remedial Plan at 212.

5

**Court Requirement 43 Training Programs (EC 3, 4)**

| 43. Training Programs (formerly 107) | Procedures for periodic evaluation shall exist and be implemented regarding training program needs, including habilitation, and sufficient hours of training programs shall be provided.  CD V.3, p. 10. IP V, ¶. 21-25, 37. |
|---|---|
| **Compliance Provisions** | |
| 1. Desired Outcome | a. Individual and group training and programs will [be] implemented and regularly evaluated.<br>b. Sufficient hours of such programs will be provided. |
| 2. Threshold | High |
| 3. Evaluation Criteria | 3. Are clients' individual and group training and programs being evaluated at least annually and recommendations made?<br>4. Are all clients provided those group training/education opportunities as defined in their OPSs? |
| 4. Review Methods | Monthly tracking of data input form.<br>OPSs and OPS reviews.<br>Training program content.<br>Interviews and observations. |

**Court Requirement 44 Day/Vocational Programs (EC 1-3)**

| 44. Day/Vocational Programs (formerly 111) | "The availability of day programs for persons who are mentally retarded is a vital component of the department's mission.  Like residential settings, day programs must be developed to meet individual client needs.  Therefore, the department is committed to the development of program designed to promote client growth and independence and to provide an array of day program opportunities, emphasizing employment, coupled with the necessary support to increase and maintain living skills."  IP VI, p. 37. |
|---|---|
| **Compliance Provisions** | |
| 1. Desired Outcomes | All clients who need Day Programs have Day Programs which meet their individual needs. |
| 2. Threshold | High |

Report to the Court No. 21 (Revised): Scope of Work for Consultant

Review at 6 n.A [Doc. No. 545].

Subsequently, five expert reviews of the Communication Services aspect of Habilitation were ordered by the Special Master, with four reviews by Dr. Stephen Calculator (one in 1999, two in 2001 and one in 2003) and one review by Dr. Joe Reichle (2003). Defendants enlisted two expert reviews by Dr. Paul Cascella (both in 2003).

---

| 3. Evaluation Criteria | 1. Are all clients who need day programs in a day program[?] <br> 2. Do all of these Day Programs meet each client's needs[?] <br> 3. Are work opportunities provided to all individuals in need of such[?] |
| 4. Review Methods | Day Program Database of Day Program Enrollment <br> Day Program Database: Field to identify if specific Day program is a match for the client's needs. In addition, referral list with time limitations identified for inclusion in a changed day program when the client's needs change. <br> Day Program database with fields identified: Work need and Work involvement. <br> Interviews and observations. |

**Court Requirement 52 Implementation of Training Programs (EC 3, 4)**

| 52. Implementation of Training Programs (formerly 67) | Consistently implement programs to protect residents from risks to personal safety and unreasonable restraint. This applies both to habilitation programs under the OPS generally and to behavior programs. 4/24/90 Order 1(V), ¶. 9-10. |
| **Compliance Provisions** | |
| 1. Desired Outcome | Provide residents with consistent implementation of safe programs that minimize restraint use. Programs are both individual and also client training/education programs to teach clients to protect themselves from risks to personal safety and unreasonable use of restraints. |
| 2. Threshold | High |
| 3. Evaluation Criteria | 3. Do assessment of staff by interview and/or sample observations confirm that there is consistent implementation? If implementation is not acceptable, have corrective steps occurred? <br> 4. Are training/education programs for clients available and are clients referred to those programs? |
| 4. Review Methods | Review residents identified from Consent Decree as 'priority' for compliance with program. <br> Interviews and observations. |

6

**Defendants' Position**

Defendants object to the Report on several grounds. Defendants argue that the Special Master and his experts used the incorrect constitutional standard when determining compliance and supplanted the professional judgment of the communications staff at STS.   Defendants also assert that they were denied due process because the Reichle report was considered by the Special Master without Reichle being available for cross-examination at the hearing and without his report being admitted into evidence. Furthermore, Defendants argue that the record does not support the Special Master's findings that more Speech-Language Pathologists (SLPs) are needed at STS and a formal fidelity mechanism must be in place for Defendants to be compliant with the Remedial Plan, Consent Decree and Implementation Plan.   Defendants also argue that it was inappropriate for the Special Master to allude to other possible deficiencies in communications programs that might be reviewed in the future without making specific findings that such deficiencies exist.   Finally, Defendants assert that the Special Master did not consider all relevant evidence, including the ICF/MR surveys.

**United States' Position**

The initial response from the United States to Defendants' Objections came in May of 2005, during the period the parties were urging this Court to accept the proposed settlement of this action.

At that point, the parties were attempting to reach a consensus regarding Communication Services, and the United States, without stating its position regarding compliance, requested that the Court defer a decision on Communication Services until the parties reached an agreement. See United States' Response to Defendants' Objections to the Special Master's Report to the Court No. 57: Communication Services [Doc. No. 1261]. Subsequently, this Court disapproved the parties' settlement agreement and all outstanding aspects of the Remedial Plan were set for compliance determination.[6] This Court then ordered the United States to file an updated response to Defendants' objections. Plaintiff's second response concurs with the findings of the Special Master and moves this Court to find Defendants not in compliance with the Remedial Plan regarding Communication Services. See United States' Response to Defendants' Objections to the Special Master's Report to the Court No. 57 and Court's Order Dated November 23, 2005 [Doc. No. 1372]. Plaintiff United States argues that the Special Master applied the correct standard of review, appropriately referenced the findings of his experts, considered all relevant evidence, and that the record supports his findings that a needs assessment of communications services staffing is required and that a fidelity and reliability mechanism is necessary under the Court Requirements.

---

[6] See Ruling on Parties' Final Revised Joint Agreement for Release of the Remedial Plan from Active Judicial Oversight [Doc. No. 1283].

8

**Standard of Review**

The Master's Report was filed pursuant to FED.R.CIV.P. 53 on April 6, 2005.  Rule 53 was amended on December 1, 2003.  Under the amended Rule, the Court must review de novo the findings of fact objected to by either party "unless the parties stipulate with the court's consent that the master's findings will be reviewed for clear error."  FED.R.CIV.P. 53(g)(3)(A).  The Court also is charged to review de novo all "objections to conclusions of law made or recommended by a master."  FED.R.CIV.P. 53(g)(4).  "In acting on a master's order, report, or recommendations, the court must afford an opportunity to be heard and may receive evidence, and may: adopt or affirm; modify; wholly or partly reject or reverse; or resubmit to the master with instructions."  FED.R.CIV.P. 53(g)(1).

Because this Court's review is de novo, it is not limited to the Master's findings of fact, nor need this Court show the findings any particular deference. Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc. 414 F.3d 325, 341 (2d Cir. 2005).  Additionally, a Master's legal conclusions are entitled to no special deference. Fogel v. Chestnutt, 668 F.2d 100, 116-17 (2d Cir. 1981), cert. denied, 459 U.S. 828 (1982).  The Court finds that the record is sufficient for a compliance determination without a further hearing.

**Discussion**

The Court commends the Special Master for the time and care with which he undertook a review of Defendants' compliance with the Communication Services aspect of Habilitation.  Having reviewed the Master's findings and conclusions <u>de novo</u>, this Court holds that the Master's findings of fact and conclusions of law that Defendants are non-compliant with regard to Communication Services are not supported by the evidence.  For the reasons set out below, this Court finds Defendants are in compliance with the Communication Services aspect of Habilitation, and all Court Requirements pertaining to Communication Services are hereby RELEASED from active judicial oversight.

**Compliance Standard**

Defendants maintain that the Special Master and his experts incorrectly imposed "minimally adequate professional standards" upon them in assessing compliance, adding new obligations not envisioned by the parties during the creation of the Remedial Plan. Defendants argue that the appropriate standard is contained in the Court Requirements and that, if the constitutional standard were applicable, it would be the <u>Youngberg v. Romeo</u> "substantial departure" standard rather than the "minimally adequate" standard referenced by the Master.  <u>See</u> Defendants' Objections at 2-7.

In finding STS deficient in the area of Communication Services, the Master notes that Defendants are not providing "minimally

adequate habilitation in the communications area." Report at 2.
He notes further that Defendants' criticisms of the standard of
review used by Dr. Calculator are misplaced because Calculator's
1999 review stated as its purpose "determining whether services
'are minimally adequate, according to current professional
standards and professional judgment,' (the classic Youngberg v.
Romeo test)." Report at 14.

Report to the Court No. 21 (Revised): Scope of Work for
Consultant Review set forth the following standard for the review
of Communication Services by the Special Master's expert:

> "This expert review will include, when appropriate under
> a given Evaluation Criterion, a determination of whether
> the professional judgment of STS staff meets standards,
> defined as:
>      A decision . . . that is not such a substantial
>      departure from accepted professional opinion,
>      practice, or standards as to demonstrate that the
>      person responsible did not base the decisions on
>      such professional opinion, practice or standards."

Report to the Court No. 21 (Revised) at 8.

The standard set forth above is in essence that set forth by
the United States Supreme Court in Youngberg v. Romeo, 457 U.S.
307, 322-23 (1982). In Youngberg, the Supreme Court held that an
individual committed to a state institution for the mentally
retarded "is entitled to minimally adequate training
[habilitation]."[7]  Id. at 322. The Court explained as follows:

---

[7]The Court interchanges "training" and "habilitation" and references the
American Psychiatric Association definition of habilitation: "The word
habilitation, . . . is commonly used to refer to programs for the mentally-
retarded because mental retardation is . . . a learning disability and

> [T]he minimally adequate training required by the
> Constitution is such training as may be reasonable in
> light of respondent's liberty interests in safety and
> freedom from unreasonable restraints.  In determining
> what is 'reasonable'. . . we emphasize that courts must
> show deference to the judgment exercised by a qualified
> professional. . . . [T]he decision, if made by a
> professional, is presumptively valid; liability may be
> imposed only when the decision by the professional is
> such a substantial departure from accepted professional
> judgment, practice, or standards as to demonstrate that
> the person responsible actually did not base the decision
> on such a judgment.

Id. at 322-23.

Furthermore, the Supreme Court cited approvingly the concurring

opinion of the Chief Judge of the Third Circuit Court of Appeals

that "the Constitution only requires that the courts make certain

that professional judgment in fact was exercised.  It is not

appropriate for the courts to specify which of several

professionally acceptable choices should have been made."  Id. at

321.

The Second Circuit, in analyzing the Youngberg decision, agreed

with the result suggested by Justice Blackmun's concurring opinion

"that an individual has a due process right to training sufficient

to prevent basic self-care skills from deteriorating."  Society for

Good Will to Retarded Children v. Cuomo, 737 F.2d 1239, 1250

(1984).  "[P]rofessional judgment" is a standard that assesses

"whether a particular decision has substantially met professionally

------

training impairment rather than an illness.  [T]he principal focus of
habilitation is upon training and development of needed skills."  Youngberg at
309 (alterations in original) (citation and internal quotation marks omitted).

accepted minimum standards." Id. at 1248.  Constitutional norms are not to be determined by the "professional judgment" of experts at trial; rather, "constitutional standards are met when the professional who made a decision exercised 'professional judgment' at the time the decision was made." Id. "The ultimate issue is whether patients' basic liberty interests are being safeguarded, not whether the optimal course of treatment as determined by some experts is being followed." Id.

Thus, residents of STS are entitled to minimally adequate habilitation services to safeguard their basic liberty interests, not optimal services, and in deciding what is reasonable, this Court must show deference to the judgment of STS professionals in implementing Communication Services under the Remedial Plan absent a showing that their decisions are "a substantial departure from accepted professional judgment, practice, or standards." Youngberg, 457 U.S. at 323.[8]

The Scope of Work for Consultant Review of Communication Services explicitly stated that the expert reviewer would make, under a particular Court Requirement Evaluation Criterion, a determination of whether the professional judgment exercised by the STS staff was not such a substantial departure from accepted professional standards, opinion or practice as to show that the

---

[8]The Court assumes that in meeting the requirements of the Remedial Plan, Consent Decree and Implementation Plan with regard to the Communication Services aspect of Habilitation, the Defendants meet the constitutional minimum requirement regarding the provision of training [habilitation].

decision was not based on such professional standards.  See Report
to the Court No. 21 (Revised) at 7-8.   The Master found that
Defendants did not provide "minimally adequate habilitation."  The
Master notes that Dr. Calculator's reports found that "services do
not meet professionally adequate standards for meeting the needs of
the clients" at STS.   See Report at 13-14.   And, as the Master
notes, Dr. Reichle and Dr. Calculator found staffing to be
"substantially insufficient."  Report at 15.  However, neither the
Special Master nor his expert reviewers found that the provision of
Communication Services at STS was a "substantial departure" from
accepted professional standards.

        In commenting on the compliance findings of the experts, the
Special Master determines that the evidence from Defendants'
expert, Dr. Paul Cascella, "is not particularly useful in
determining compliance."  Report at 12.  The Special Master finds
that Cascella did not seek to demonstrate that Communication
Services were provided with "minimal professional standards," and
that Cascella failed to "look behind STS' evaluation of clients'
needs" and showed "blind uncritical deference" to Defendants'
professional judgments.  Id. at 13.  The Special Master notes that
Dr. Calculator explicitly addressed compliance with the Remedial
Plan, and that his evidence is persuasive.  Id.

14

**Staffing**

The Special Master concludes that the number of professional speech-language pathologists at STS is insufficient. He finds that the "credible expert reports and testimony" and findings from "two experts of unquestioned credentials" (the Special Master's two expert reviewers, Drs. Calculator and Reichle) establish that professional staff should be doubled to meet minimal standards. Report at 2. He notes further that Dr. Calculator had expressed concern over the staffing levels at STS as far back as 1999, and that Dr. Reichle found the speech-language pathology staff to client ratio "not acceptable by any reasonable standard of service." Report at 16, 24-25. Dr. Calculator suggested that additional SLP staff would allow the following: 1) an increased presence of SLPs in day programs and residences; 2) a more active role of SLPs in client programs; 3) an increased number of teaching strategies for clients; and 4) more active monitoring of programs. Report at 25-26. The Special Master recommends that the Court order the addition of 3 SLPs to enable these same "service improvements." Report at 3. However, 1) neither expert conducted a staffing needs assessment before making these determinations; 2) neither expert cited a professional standard regarding ratios or staffing levels from which Defendants were substantially departing; 3) neither expert cited a single case where a resident of STS failed to receive speech-language services and the professional

15

staff failed to provide an "appropriate level of therapy" under CR 27; and 4) neither the Consent Decree, the Implementation Plan nor the Court Requirements in the Remedial Plan set forth a particular speech-language pathologist-to-client ratio or require such "service improvements."  The Court finds no reason to discount Dr. Cascella's reports and testimony as not credible, and notes that his credentials were similarly never in question.  The Special Master faults Dr. Cascella for not examining the workload or responsibilities of the professional communications staff, Report at 13, but the Scope of Work for Consultant Review of Habilitation does not entail an examination of workload or responsibilities. Furthermore, neither Dr. Calculator nor Dr. Reichle examined the workload or responsibilities of the SLPs.  Dr. Calculator's June 2003 report suggests that the addition of SLP staff will lead to a proportionate increase in the number of teaching strategies at STS. Report Vol. 3 at 209 (United States' Exh. 1).[9]  And, Dr. Calculator concluded, without any individual assessment, that the large number of residents at STS not using any form of augmentative and alternative communication (AAC) evidenced a violation of the professional principle that individuals for whom speech is not a

---

[9]Dr. Calculator backed away from this claim on cross-examination. And, in his October 2001 report, Dr. Calculator stated that the majority of files he had reviewed did not contain communications teaching strategies. Defendants reviewed the same 13 files and found that: 1) seven of the files did contain teaching strategies; 2) three files contained recent evaluations indicating no need for a teaching strategy; and 3) the remaining three residents were verbal and could communicate clearly, obviating the need for communication teaching strategies.  Report Vol. 3 at 22 (Defendants' Exh. 3).

viable method of communication should be considered candidates for AAC. Report Vol. 3 at 214 (United States' Exh. 1). Dr. Calculator testified that he has no knowledge of anyone at STS who was not considered for AAC, and that there was no professional literature regarding the percentage of residents at STS who should have been using AAC to which he could refer. Report Vol. 1 § III at 83. Dr. Cascella and Defendants' SLP staff testified that teaching strategies and the use of AAC must be based upon individual assessment of residents. Thus, a compliance determination based, inter alia, on assumptions that such individuals were never considered for AAC without an individual assessment or without inquiring of STS professional staff whether they were evaluated, is of little use to the Court.[10] The opinions of Drs. Reichle and Calculator with regard to the provision of Communication Services at STS reflect dissatisfaction with the service delivery model at STS and a preference for interventions that would be more consistent with a "direct service" model.[11] The Remedial Plan

_____

[10]See Report Vol. 1 § III at 68: Dr. Calculator's June 2003 report queried as to why Charles K. was "not having a more complex AAC system with voice output" and "would he benefit from picture software." However, Dr. Calculator neither evaluated Charles K. nor inquired of any SLP whether or how he had been evaluated for AAC needs.
    Similarly, Dr. Calculator's observation that it was problematic that 39 AAC devices remained unused in storage is not helpful for compliance determination without evidence that any individual needing and potentially benefitting from such a device was denied the opportunity to be trained on or use such a device.

[11]Dr. Calculator's dissatisfaction with the model at STS is evidenced in his statement that he found the model of service delivery at STS was inconsistent with accepted practice. Report Vol. 1 § III at 156.
    When asked if he thought the staffing of SLPs was sufficient, he answered that it was not adequate in order to do everything that had been

17

requires no specific model of service delivery.  See Report to the Court No. 21 (Revised), Remedial Plan Court Requirement 27.  Dr. Cascella testified that "Southbury has a model for doing person-centered individualized communication assessment, communication programming, and that system needs to be respected."  Report Vol. 1 § II at 80.[12]  It is inappropriate for the Court to determine which of several professionally acceptable choices in service delivery should be made.  Youngberg, 457 U.S. at 321.

_____

recommended [by him].  Report Vol. 1 § III at 154.
     The communication services system at STS can be described as a modified consultative/collaborative model.  The model is consultative to the extent that service recommendations are made based upon evaluations by SLPs and residential support staff are primarily responsible for implementing habilitation programs.  The model is collaborative in that interdisciplinary team members work together to provide a range of communication services to meet the individual's needs.  Report Vol. 1 § I at 99-100; Report Vol. 2 § IV at 161-62, 199-200.  In contrast, a direct service model usually employs a Speech-Language Pathologist working one-on-one or in small groups with an individual, most often on a weekly basis.  Report Vol. 1 § I at 100.  The consultation model is found across most work settings that employ Speech-Language Pathologists.  Report Vol. 3 at 153 (Defendants' Exh. 13).
     See also Report Vol. 1 § III at 72-73.  There are numerous instances where Dr. Calculator made suggestions for service improvements for which he could cite no professional standards to support such suggestions and which were above and beyond the requirements of the Remedial Plan.  For example, Dr. Calculator criticized STS for typically failing to complete a follow-up evaluation on a resident after an evaluation had already been completed and there was a subsequent referral, yet he could cite to no specific instances where that occurred nor could he cite to any professional standard that required such action.  Among other service improvements he found necessary for compliance but for which he could cite no professional standard nor any Court Requirement were: "[a]ll referrals to the communications department will prompt a visit by the SLP to the day habilitation and/or residential program; and "[a]nytime a change in program is implemented, the SLP will visit the client's day program and residence to initiate the new program."

     [12]As Cascella noted, a communication assessment looks at the individual, examining care-giver patterns, environmental factors, the opportunities that are given to people to communicate, whether people are given opportunities to participate in making decisions about their own life, and whether communication training or intervention can give them that capacity.  Report Vol. 1 § II at 78-79.

18

With regard to staffing needs, the Special Master notes that the Director of STS Clinical Services, Nedra Navage, acknowledged that the needs of an aging population at STS may result in increased speech therapy needs. Report at 21. However, in his February 2001 review of Communication Services, the Master's consultant, Dr. Calculator, stated that "[a]s the population continues to age, the need for communication services may diminish." Report Vol. 3 at 233 (United States' Exh. 2). Dr. Calculator explains this as follows:

> [T]here are many senior citizens at STS whose communication skills have not changed in years, despite intervention, and whose skills are adequate in their residences and day programs. Rather than implementing communication interventions, these individuals would benefit more from participation in social groups, where communication is integrated for purposes of enhancing the pleasure they receive from social interactions. There are also individuals with severely limited communication skills, whose skills have not changed in years despite various forms of intervention. Once this is documented, there may not be a need for communication services other than those provided in conjunction with the OPS review (the same would hold for some members of the elderly population). In the event of a change in communication status/ability, either positive or negative, these same individuals would become priorities for communication services.

Report Vol. 3 at 233.

And, even if the aging population at STS develops increased speech therapy needs, there was no evidence presented that more staff would be required to meet those needs.

At the time of the hearings, STS had 4.5 full-time-equivalent ("FTE") SLP positions authorized in the Communications Department.

19

One position was vacant, so there were 3.5 FTEs.  See Report Vol. 2, § V at 207.  The Special Master adjusted these hours to account for the administrative duties of Linda Kane-Hahn, the Supervisor of the Communications Department, and calculated a FTE figure of 2.8. See Report Vol. 2, § V at 208.  Defendants' latest Quarterly Report states that one full-time SLP position has remained open since August of 2005, with recruitment efforts ongoing, and one position was filled in November of 2005.   See Thirty-Fourth Quarterly Compliance Report [Doc. No. 1387].  Nedra Nevage, the Director of Health Services, testified at the hearing that STS has had difficulties recruiting SLPs for the Communication Department because there are not many speech and language professionals interested in working with the population at STS.  Report Vol. 2 § V at 23-24.  The Court recently ordered Defendants to provide updated and detailed information on the efforts to recruit and hire a Speech-Language Pathologist to fill the vacancy created in August of 2005 [Doc. No. 1394].  Defendants have submitted such information, and the Court is satisfied that such efforts show full compliance with the requirements of CR 27.  See Defendants' Response to Order Dated March 8, 2006 [Doc. No. 1395].[13]  The Court

---

[13]When fully staffed, STS has a complement of 4.5 FTE SLPs.  Since STS has found it difficult to recruit a half-time SLP, they have been working since May 2005 to fill 5.0 FTE positions.  Defendants have worked with a national contractor to advertise and recruit for SLP positions, and that contractor has placed advertisements in the professional journals serving SLPs as well as engaged in direct marketing to a few thousand SLPs in New England and the Northeastern United States.  The contractor has also used a telephone bank to contact approximately 500 SLPs a week to solicit interest in working for the contractor (who would then provide the SLP service to STS).  The SLP

expects that Defendants shall continue to make their best efforts to fill vacancies, as they arise, up to the level of 5.0 FTE Speech-Language Pathologists.

At the hearings, the Communications Department Supervisor Linda Kane-Hahn testified that, in her professional opinion, STS has maintained compliance with the Court Requirements pertaining to Communication Services, and that current staffing meets the needs of the residents at STS, based on her own experience and feedback from her staff of SLPs. Report Vol. 2 § V at 183, Report Vol. 3 at 179 (Defendants' Exh. 16). One of the SLPs, Carleen Bell, stated that Communication Services at STS meet accepted professional standards, and she and her colleagues are responsive to the needs of the STS residents, meet their job requirements and have no problems keeping up-to-date with their work. See Report Vol. 1 § II at 139-140, 203, 218-219. Another SLP, Victoria Murren, testified that the model of service provision at STS serves the residents' best interests, and that STS is in compliance with the Court Requirements. Report Vol. 2 § VI at 107-108; Report Vol. 1 § II at 278. While acknowledging this testimony, the Special

who began work in November of 2005 resigned in February of 2006, leaving a vacancy of 1.5 FTEs. Subsequently, Defendants received the curriculum vitae for another SLP from the contracting agency, and Defendants have represented that they expect that candidate will shortly join the Communications staff, leaving a 0.5 FTE vacancy. Defendants will continue to recruit for another full-time-equivalent SLP to bring the complement up to 5.0 FTEs, and maintain that all speech-language needs of the residents at STS are being met in accordance with accepted professional standards in the interim. Defendants believe a complement of 5.0 FTEs will allow them to "significantly exceed accepted professional standards, as has always been the goal of STS." Defendants' Response to Order Dated March 8, 2006 at 1-4.

Master gives more weight to the statement of a "Communications Department staff person" that, with their larger caseloads, SLPs are unable to spend adequate time in cottages and are "spread pretty thin." Report at 23. That staff person is Jim Grenier, a support staff person in the Communications Department, referred to elsewhere in the Master's Report as someone who "is not a professional; his highest education is high school." Report at 19. Grenier is not an SLP and his opinion that SLPs are spread thin does not equal evidence of non-compliance with the Court Requirements. The Master also credits the testimony of Dr. Michael Neiman, a contracted part-time SLP, and finds that "Dr. Neiman testified that SLP staffing at the time of the hearing was insufficient, [stating] 'I feel that the addition of some more staff would be beneficial.'" Report at 24. The Court finds no evidence in the record that Dr. Neiman testified that staffing was insufficient. Dr. Neiman did testify that the addition of more staff would be beneficial, and when asked how many additional positions STS would need to provide appropriate and timely communication services, he stated: "I would say, in addition to the current clinical staff which comprises Linda Kane-Hahn, Carleen Bell and Victoria Murren, another full-time position . . . so an additional 35 hours, whether it be somebody else 35 or would that include me plus whoever else could supplement that to equal 35." Report Vol. 2 § IV at 44-47. At the time of the hearing, Ms. Kane-

Hahn's position was 30 hours per week, and both Ms. Bell and Ms. Murren were full-time at 35 hours.  Clearly, Dr. Neiman's opinion was that the addition of one FTE position would be beneficial, as it would bring STS up to three full-time SLPs in addition to Ms. Kane-Hahn, not that additional staff beyond the authorized complement was needed.  Even if Dr. Neiman had meant that the addition of staff beyond the authorized complement of 4.5 FTEs was beneficial, neither the Remedial Plan nor the Youngberg standard require the addition of speech-language pathology staff simply because it would be beneficial.

The Master found that Defendants' expert Dr. Cascella was in agreement with Drs. Calculator and Reichle that a needs assessment was required to determine how many SLPs are needed at STS.  The Master also found that Drs. Calculator and Reichle determined that, at a minimum, the number of SLPs on staff had to be doubled to meet minimal standards of service, *prior to any determination through a needs assessment*.  Report at 24.  Dr. Cascella did opine that a needs assessment should occur, but his testimony was that such a needs assessment was not required for or related to a finding of compliance with the Court Requirements of the Remedial Plan pertaining to Communication Services.  See Report Vol. 1 § II at 115.  Neither Dr. Calculator nor Dr. Reichle cited to any professional standard from which Defendants were substantially departing to justify doubling the number of Speech-Language

Pathologists at STS.

**Formal Fidelity Mechanism**

The Special Master concludes that STS has no mechanism "at any level" to ensure or demonstrate that communications programs are appropriately implemented. Report at 17, 27. He finds that "a communications program in an OPS is meaningless unless it is faithfully implemented and the speech/language professionals. . . can depend on the reliability of staff reports of both implementation and the client's response to the program." Report at 15. He further asserts that the Defendants' expert witness Dr. Cascella, the Special Master's consultants and STS staff all state that there is no method in place at STS to ensure fidelity and reliability of communications programs, and that such a system should be put in place. Report at 15, 17.

Court Requirements 43, 44 and 52 do not require a formal fidelity mechanism with regard to Communication Services, or any particular type of system to ensure fidelity and reliability. Training Programs under CR 43 must be evaluated at least yearly to ensure that the opportunities provided are those defined in each resident's Overall Plan of Service (OPS). Day Programs under CR 44 must be developed, implemented and evaluated to ensure they meet each resident's individual needs. Training Programs under CR 52 must be consistently implemented to protect residents from risks to personal safety and unreasonable restraint. Defendants can

24

evaluate the effectiveness of the programs under CR 52 through both staff interviews and sample observations.   See Remedial Plan at 232a, 233, 250a.  Beyond these strictures, the professionals in the Communications Department must determine how best to carry through these requirements based on their professional opinion.

At STS, each resident is assigned to a specific Speech-Language Pathologist's caseload.  A functional communication assessment is conducted on each resident at least every five years by an SLP, more often if a referral is requested.  Report Vol. 2 § V at 143-44.  SLPs receive referrals from numerous sources, including the Interdisciplinary Team (IDT), direct care staff, and program supervisors.  Report Vol. 3 at 145 (Defendants' Exh. 12).  Contrary to Dr. Calculator's observation, the evidence established that SLPs regularly visit residents at cottages and day program sites and always personally observe residents when conducting communications assessments.   Report Vol. 3 at 145 (Defendants' Exh. 12), 181 (Defendants' Exh. 16).  A functional communication assessment tool was developed in response to the suggestions in Dr. Calculator's 1999 report, and both he and the Special Master commended Defendants for developing the tool and Dr. Calculator suggested STS consider publishing the tool.   Report Vol. 2 § V at 127-28. Fourteenth Quarterly Report at 12 [Doc. No. 544].  From early 2001 until the time of the Communications hearing, the Communications Department at STS conducted approximately 511 evaluations of

25

residents using this tool.  Report <u>Vol. 2</u> § V at 249-251.  If the conclusion of a particular evaluation is that a resident will benefit from a teaching strategy,[14] and the recommendation is approved by the IDT, the SLP provides the support staff with the behavioral objectives, rationale and basic steps for the teaching strategy.  Report <u>Vol. 2</u> § V at 137-38.  The support staff then writes out a teaching strategy which is subsequently edited, reviewed and approved by the SLP.  <u>Id.</u>  <u>See also</u> Report <u>Vol. 2</u> § V at 35.  The data for teaching strategies and AAC systems is compiled monthly from each cottage and entered into the Quarterly Review form; Jim Grenier notifies SLPs if there are any anomalies. Report <u>Vol. 2</u> § IV at 88-89; Report <u>Vol. 3</u> at 177 (Defendants' Exh. 14).  The SLPs review both the tabulated data and the raw data and verify the data recorded by the direct care staff on a quarterly basis.  That review is part of the OPS process.[15]  Report <u>Vol. 1</u> § II at 258-260; Report <u>Vol. 3</u> at 144 (Defendants' Exh. 12).

The Master and Plaintiff United States are correct that, in his testimony, Dr. Cascella agreed that it would be a good practice to have a fidelity mechanism.  But, he did not find such a mechanism

---

[14]A "teaching strategy" is designed to teach a person a new communication skill that is not in their current repertoire.  In contrast, person-specific communication guidelines are developed to ensure that staff will make sure the resident's existing skills are actualized throughout an individual's daily routine.  Report <u>Vol. 1</u> § I at 45.

[15]Under the OPS process, the residential team reviews the habilitation programs for all residents annually, including communication services plans. Additionally, the teaching strategies and other communications guidelines for a particular resident are reviewed by the IDT on a quarterly basis.  These are also the OPS guidelines for ICF/MR facilities.  Report <u>Vol. 1</u> § I at 27.

was required under the Remedial Plan Court Requirements.   He expressed concern that there was no staff person "specifically watching staff implement teaching strategies," but this was not linked to a specific Court Requirement.   Report Vol. 1 § I at 96. See also Report Vol. 1 § II at 103-04.   The Court agrees that such a mechanism would be a good practice, but it is not required to find compliance.   The Master asked Cascella to clarify whether or not such oversight was required under CR 52, to which Cascella replied: "[I]f you look at the overall plan of service in a quarterly review process, you would learn . . . how consistent plans are being implemented." Id. at 97.   Dr. Cascella went on to testify that, although he expressed disappointment that no formal oversight mechanism regarding teaching strategies was in place, "there are other mechanisms in place that guarantee the consistent implementation . . . there are many other mechanisms in place that monitored communication programs." Id.

Dr. Cascella noted at least eight methods of quality assurance at STS, in addition to the annual and quarterly review process, including: 1) new and ongoing training procedures for communication habilitation, which include proactive methods for supporting communication in residential and vocational settings; 2) a residential program monitoring and quality assurance form which is completed by residential supervisors based on monthly observations of staff that document particular quality of service indicators

including communication; 3) a "family group system" requiring residential staff members to review and sign off on OPS documentation quarterly, including teaching strategies; 4) a Quality Management Council, whose discussions include issues relating to habilitation services and which meets monthly; 5) Quality Improvement teams which review habilitation issues on the unit level quarterly; 6) a Program Review Committee which meets twice per month and provides oversight of behavior habilitation plans; 7) monthly Quality Enhancement Reviews which assess the quality of residential and day services; and 8) a facility-wide monthly "report card" where the Office of Quality Enhancement and the Quality Management Council review residential data documenting referrals and follow-up sessions for habilitation.  Report <u>Vol. 3</u> at 71-73 (Defendants' Exh. 6).[16]  In asking STS staff to detail the teaching strategies employed for individual residents of STS, Cascella found that "the staff members had a good working knowledge of the communication teaching strategies, . . . person-specific guidelines, and that they had a level of sensitivity regarding the ways in which the residents communicated, and they were readily able to interpret idiosyncratic actions and assign communication value to those."  Report <u>Vol. 1</u> § II at 67-68.

In his testimony, Dr. Calculator agreed with Dr. Cascella that

---

[16]Cascella also noted that, in his experience with New York and Connecticut institutions and group home agencies, he has not seen more quality assurance measures than those in place at STS.  Report <u>Vol. 1</u> § I at 86.

clients are receiving services as defined in their OPS and that none of Dr. Cascella's opinions are inconsistent with accepted professional standards.  Report <u>Vol. 1</u> § III at 32-34.  Dr. Calculator could point to no needed service that was not provided, nor could he show one person who should have had a teaching strategy at STS but did not have one.  Report <u>Vol. 1</u> § III at 58. Dr. Calculator had recommended, in finding "partial" non-compliance, that STS "conduct reliability checks in day programs or . . . residences one time per month" but he agreed that there was no written standard to which he could cite to support such a recommendation.  Report <u>Vol. 1</u> § III at 63-64.

The Special Master stated that a communications program is meaningless unless it is faithfully implemented and the SLPs can depend on the reliability of staff reports as to its implementation and the client's response.  There was no evidence presented at the hearings that any of the programs were not being implemented as intended by the SLPs or that the SLPs could not depend on the reliability of staff reporting.

**Compliance with Specific Court Requirements Pertaining to the Communication Services Aspect of Habilitation**

Under the Remedial Plan, STS must show compliance with the following Court Requirements as they pertain to Communication Services: CR 27 Occupational, Physical and Speech Therapy; CR 43 Training Programs (EC 3, 4); CR 44 Day/Vocational Programs (EC 1-3); and CR 52 Implementation of Training Programs (EC 3, 4).  The

29

Special Master made no specific findings for each of these Court Requirements. Upon a _de novo_ review of the record, the Court finds compliance with each Court Requirement as it pertains to the Communication Services aspect of Habilitation. Nothing at the hearing or in the record casts doubt on Defendants' self reporting of compliance. There was no evidence presented that training programs were not provided or evaluated under CR 43, or that all residents who need day programs are not provided with such or are not provided with a program that meets their individual needs under CR 44,[17] or that training programs are not evaluated or consistently implemented under CR 52. All residents receive the mandated communications evaluation every five years or sooner, the OPS process evaluates and reviews residents' training needs yearly, all those who need day programs are in one that has been designed to meet their needs, and a variety of Quality Assurance mechanisms guarantee consistent implementation of programs under CR 52. Report _Vol. 3_ at 71-74 (Defendants' Exh. 6), 185 (Defendants' Exh. 19); Report _Vol. 1_ § I at 27. Furthermore, STS has implemented many of the recommendations made by Dr. Calculator, including the revision of the communication assessment tool, the creation of sign

---

[17]Dr. Cascella's review of communication services with regard to CR 44 determined that more than 99% of STS residents participate in a day program: in 2003, 173 residents attended day programs off-campus, 450 residents attended a day program at STS, 15 residents had home-bound programs, and 5 residents did not attend a day program. Report _Vol. 3_ at 74 (Defendants' Exh. 6). As Cascella noted, the IDT meets annually and quarterly to determine if each resident's day program needs are being met.

language books for individual residents, and expansion of the AAC inventory and database. Ms. Nevage stated that these recommendations were implemented to improve Communication Services at STS beyond the requirements in the Remedial Plan, but were not understood to be necessary to achieve compliance with the Court Requirements. Report <u>Vol. 3</u> at 186 (Defendants' Exh. 19).

**Conclusion**

The Court finds that, after reviewing the record in light of the Court Requirements under the Remedial Plan and the Constitutional standard, STS has not substantially departed from accepted professional standards in the provision of Communication Services to the residents of STS and has been in sustained compliance with the Court Requirements in the Remedial Plan pertaining to Communication Services. Therefore, this Court must defer to the professional judgment of the staff at STS under its modified consultative-collaborative model. "The ultimate issue is whether patients' basic liberty interests are being safeguarded, not whether the optimal course of treatment as determined by some experts is being followed." <u>Society for Good Will to Retarded Children</u>, 737 F.2d at 1248. The Court is assured that the liberty interests of the residents at Southbury Training School are being safeguarded with regard to the Communication Services aspect of Habilitation as envisioned under the Consent Decree, the Implementation Plan, the Remedial Plan and all associated orders.

All Remedial Plan Court Requirements related to the Communication Services aspect of Habilitation are hereby RELEASED from active judicial oversight.

SO ORDERED.

_____
ELLEN BREE BURNS, SENIOR JUDGE
UNITED STATES DISTRICT COURT

Dated at New Haven, CT, this ____ day of March, 2006.