UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,      :
            Plaintiff,         :
                               :
         v.                    :      No.3:86CV252(EBB)
                               :
STATE OF CONNECTICUT, et al., :
            Defendants         :

### Order Purging Defendants of Contempt and Ending Active Judicial Oversight

Before the Court is the Special Master's Report to the Court No. 62: Safeguards and Maintenance of Effort ("Report") [Doc. No. 1381].  The Court accepts and approves the Report[1] and incorporates it into this Order by reference.

On September 11, 1985, following an investigation by the United States Department of Justice under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997 et seq., Plaintiff United States brought this action against the State of Connecticut, the Governor, the Commissioner of the Department of Mental Retardation ("DMR"), and the Director of Southbury Training School ("STS") pursuant to CRIPA, informing Defendants that Plaintiff had reasonable cause to believe that persons residing in or confined to STS were being subjected to egregious and flagrant

_____

[1]The Court addresses all remaining aspects of the Remedial Plan in this ruling.  The Master's Report to the Court No. 62 did not address Communications as the Master previously found Defendants in non-compliance on that issue, and the matter was still pending before this Court at the time the Master submitted the Report.
    The Report contains minor inaccuracies which this Court does not adopt. See e.g. Report at 22, Recommendation 1 – this Court found Defendants in contempt on June 19, 1996.

conditions depriving them of their rights secured by the Constitution of the United States.  In lieu of litigation, the United States and Defendants entered into a Consent Decree which this Court so ordered on December 22, 1986.  The Consent Decree required the Defendants to submit an Implementation Plan, which was adopted by the Court on July 21, 1988.

On June 19, 1996, this Court found Defendants in contempt of the Consent Decree, the Implementation Plan and the Court Orders of April 24, 1990 and December 9, 1991 (collectively the "Remedial Orders").  United States v. State of Connecticut, 931 F. Supp. 974 (D. Conn. 1996), appeal dismissed, 1997 U.S. App. LEXIS 21006 (2d Cir. June 13, 1997).  This Court stated that a finding of contempt was appropriate when the Court Orders were clear and unambiguous, the moving party established non-compliance by clear and convincing evidence, and Defendants had not exercised reasonable diligence in attempting to comply with the Court Orders.  Id. at 976.  Plaintiff alleged, and the Court so found, that the Defendants were in contempt of the Remedial Orders in three areas: psychological services, medical services and physical therapy services.  Id.  The Court found that, although the Defendants' quarterly reporting showed compliance with over 90% of the Remedial Orders' requirements, the systemic flaws at STS caused many residents to suffer grave harm, including death.  Id. at 983-84.

To ensure that the purposes of the Remedial Orders would be effectuated, the Court, with the concurrence of the parties, appointed David Ferleger as Special Master under its inherent power to appoint an agent to oversee the implementation of a consent decree.[2]  A Remedial Plan was developed by the Special Master in conjunction with the parties and adopted by the Court on April 21, 1998.  Since that time, the Special Master has proceeded to review the outstanding Remedial Plan requirements and recommend release when compliance has been achieved and sustained.  This Court now determines that Defendants have fully and faithfully implemented all provisions of the Remedial Plan, and Defendants are released from the finding of contempt and active judicial oversight.[3]  The Special Master is discharged from his duties with the gratitude of the Court for his service.  The Court Requirements in the Remedial Plan will continue as an injunction, the Consent Decree and Remedial Orders will remain in effect, and this Court will retain jurisdiction until the judgment is discharged, as provided in the Court's Order of April 24, 1990 [Doc. No. 73].[4]

The Master's Report commends Defendants for their successful effort to achieve sustained compliance and highlights priority

---

[2]931 F. Supp. 974, 984 (D. Conn. 1996) (citing In re Peterson, 253 U.S. 300, 312-13 (1920); Berger v. Heckler, 771 F.2d 1556, 1568 (2d Cir. 1985); Ruiz v. Estelle, 679 F.2d 1115, 1161 (5th Cir. 1982)).

[3]N.L.R.B. v. J.P. Stevens & Co., Inc., 563 F.2d 8, 16 (2d Cir. 1977).

[4]Thus, for example, the Court will still receive the quarterly compliance reports as mandated by the Consent Decree until the Consent Decree is terminated.  See Consent Decree § VI. 2.A.

areas, termed "sentinel mandates," which, based on the last nine years' experience, the Special Master finds are "most in need of vigilant attention" by the State of Connecticut and the United States to ensure that the Defendants maintain their commitments under the Consent Decree and Remedial Orders.[5]  Along with these sentinel components, the Master expects that the Quality Assurance Plan, Outcome Expectations identified by Defendants in 2002,[6] a periodic expert evaluation of the Quality Assurance Plan, and the continuing injunction imposed by the Consent Decree, the Remedial Plan and the associated orders will serve as the safeguards and maintenance of effort protections for residents of STS.

The Special Master's report highlights the progress in each of the areas he deems priorities.  This Court commends the parties on

---

[5]See Special Master's Report to the Court No. 62: Safeguards & Maintenance of Effort. These areas are:
   A.   Habilitation and Case Management
   B.   Staff Training
   C.   Physical Therapy
   D.   Protection from Abuse and Neglect
   E.   Implementation of Behavior Plans
   F.   Aging Plan
   G.   Advocacy
   H.   Medical

[6]Defendants' "STS. . . After Judicial Oversight 'What Dreams May Come'" (Jan. 31, 2002).  This document was never filed with the Court; it is referenced in the Special Master's Report to the Court No. 40: Quality Assurance Plan [Doc. No. 811] and Report to the Court No. 62: Safeguards and Maintenance of Effort [Doc. No. 1381].  The outcomes are as follows:
   1.   Good health and good health management;
   2.   Freedom from undue restriction or restraint;
   3.   Meaningful and enjoyable activities, commensurate with one's capacity and stamina;
   4.   Opportunity for personal growth and development;
   5.   Minimization of untoward events;
   6.   Engagement with friends, family, staff and peers; and
   7.   Safety.

the progress made in those areas, and specifically notes below the compliance achieved in the three broad areas which were the focus of this Court's finding of contempt in 1996.

**Physical Therapy**

In 1996, this Court found the provision of physical therapy services at STS to be below professional standards, mainly due to grossly inadequate staffing. Only seventeen of the 244 residents receiving physical therapy services were receiving such services from a licensed physical therapist. Among other shortcomings, guidelines to assess staff competence to provide physical therapy services were nonexistent, no methodology existed to document the provision of services, and residents were in danger of receiving physical therapy services from incompetent persons. In short, residents were at risk of receiving "ineffective, useless, and detrimental therapy." 931 F. Supp. 974, 983. The Remedial Plan required Defendants to provide appropriate physical therapy within 30 days of a referral, and mandated that clients would receive treatments ordered by physicians and implemented by physical therapists as well as procedures recommended by therapists and implemented by assigned persons. Extensive record-keeping was mandated, and Defendants were required to document service provision as well as the monitoring of that service provision. The same consultant who found deficiencies prior to the contempt proceeding reviewed services in 2001 and found Defendants in

5

compliance with most aspects of the Remedial Plan pertaining to physical therapy. Defendants and Plaintiff thereafter worked cooperatively to address a few areas of concern raised by the consultant. The result of such efforts was the development of STS policies on the implementation of physical therapy intervention programs and client positioning needs, and the recommendation for release of Defendants from all remaining provisions of the Remedial Plan pertaining to Physical Therapy. By 2002, Defendants has been found compliant with regard to physical therapy staffing and the quality of physical therapy provided to residents.

**Medical Services**

The Remedial Orders require the provision of adequate medical care pursuant to the exercise of professional judgment by a qualified professional. At the time this Court found Defendants in contempt of the Remedial Orders, patient problems lists were incomplete or inaccurate, record-keeping procedures were below professional standards, there was no adequate medical follow-up for some documented medical concerns, and the elaborate process developed for prescribing medicine worsened the quality of care. 931 F. Supp. at 980-82. The Court detailed the unfortunate errors and appalling examples of inadequate medical care which possibly contributed to the death of one resident. In another instance, the program review committee (PRC), which functioned as the final decision-maker regarding medication, disapproved a psychiatrist's

medication request for a particular resident.   In effect, "unqualified (e.g. unlicensed) personnel . . . [were] making major decisions regarding pharmacological interventions." Id. at 982.

In January of 2006, the Special Master's consultant reviewed the provision of medical services at STS.   His report found Defendants in compliance with all remaining aspects of the Remedial Plan pertaining to medical services. See Consultation and Review of Medical Services: Report to the Special Master ("Medical Services Review") [Doc. No. 1386].   In contrast to the situation in 1996, the consultant found that "the process of maintaining and monitoring the quality of care appears to be well established at STS," and "the medical staff at STS are extremely dedicated and well-trained," delivering "high quality medical services to a complex group of patients."[7]   The consultant opined that the instrument and process used for quality assurance is appropriate and identifies areas of concern so that corrective action can be taken.   Problems regarding the documentation of referrals and timely access to medical specialty services appear to have been

_____

[7]Consultation and Review of Medical Services: Report to the Special Master at 34.  The consultant, Dr. Bauer, also noted that a few of the medical providers at STS opined that the quality of medical care afforded the residents of STS is considerably better than that provided in the general population.
       While finding compliance with all outstanding aspects of the Remedial Plan pertaining to medical services, the Court notes that the consultant also made recommendations for further improvement in the delivery of medical services at STS.  Such improvements would bring STS above and beyond the requirements of the Remedial Plan.  This Court assumes that the system in STS is now self-sustaining and that Defendants will strive to improve beyond the period of active judicial oversight.

resolved with the implementation of effective scheduling and tracking systems for consultations at the STS clinics and in the community and the designation of a community nurse scheduler.

Furthermore, STS has come into compliance on resident problem lists by the inclusion of an Active Problem List (APL) at the front of each resident's medical chart. These lists were often incomplete or inaccurate at the time of the contempt finding; the consultant found that STS has largely transitioned toward typed APLs that follow a standardized template, thus providing a greater clinical benefit in the opinion of the consultant. Even the few handwritten APLs reviewed were found adequate.

With regard to acute hospital admission services and specialty services, STS has developed a smooth working relationship with two nearby hospitals, and there is an efficient system for emergency transport to hospitals. Each resident's chart has an emergency packet containing essential information to accompany them to the hospital.

With regard to unscheduled hospitalizations, the consultant found that the rate of hospitalizations does not seem out of the expected range, and the monitoring process in place at STS to evaluate the quality of the process is carried out with "diligence and integrity." Medical Services Review at 29. The consultant noted that his independent efforts to verify that level of care suggest that "the clinical management of unscheduled admissions is,

8

in fact, well done at STS."  Id. at 30.  As a result of these findings of compliance and the Special Master's recommendation that the Court release the outstanding Remedial Plan requirements relating to Medical Services, this Court released Medical Services from active judicial oversight.

**Psychological Services**

In 1996, the Court's concerns regarding Psychological Services focused on the ineffective implementation of behavior plans, the failure of STS to protect its residents from injury to themselves and unreasonable risk of injury by other residents, the failure of the institution to keep residents actively engaged, and the use of behavioral medication in lieu of training programs and habilitation.  STS was conforming to the letter of the Remedial Orders, but not effectuating the spirit and purpose of the orders, and thereby not producing the required results.  In stark contrast to the situation in 1996, by August 2005, over 89% of the residents at STS had benefitted from the Overall Plan of Service ("OPS") Initiative/Habilitation Initiative begun in late 2002.  This Initiative was a "best practice" adopted by STS to provide person-centered overall plans, moving away from the old model of deficit-driven planning.[8]

Additionally, with regard to protection of residents from abuse and neglect, the Special Master's Report notes the dramatic

---

[8]See Ruling on Case Management Plan Compliance [Doc. No. 1347] at 23-25.

changes at STS that serve to keep clients safer.  There are several trained staff working in an autonomous Human Rights Office who conduct extensive and professional investigations and track and analyze trends and cases of abuse and neglect.  Follow-up on recommendations from investigations occurs regularly, and incidences of abuse and neglect have declined significantly.  And, as the Special Master noted in Report to the Court No. 54: Abuse/Neglect Client Training [Doc. No. 1107], residents of STS are now trained in protecting themselves from abuse and neglect and in reporting such treatment to the authorities.

Furthermore, in contrast to the situation in 1996, where the evidence demonstrated that staff members did not keep the residents actively engaged, the consultant appointed by the Special Master to review Habilitation at STS in November of 2005 found that "[i]n every unit[,] staff (including supervisors) were actively interacting with people, as opposed to congregating together or occupying themselves with administrative tasks." Habilitation Services at Southbury Training School ("Habilitation Report") at 11 [Doc. No. 1344 Exh. 1].  And, in contrast to the ineffective implementation of behavior plans at the time of the contempt finding, the consultant found in 2005 that "the level of cognitive or physical ability didn't translate into 'cookie cutter' [Behavior] Plans.  Each was unique and reflected individual strengths, abilities, needs and wants, which in turn were

translated into individualized goals for the coming year."[9] Habilitation Report at 12.  The Habilitation Report ended with the following observations: "Every single staff person was positive, engaging with the people they serve, and having fun. . . .  We saw lots of little displays of caring that were unexpected." Habilitation Report at 21.

**Conclusion**

Special Master David Ferleger has effectively rendered a great public service in shepherding this process through to its conclusion.  He has submitted to the Court twenty-six periodic status reports, sixty-three numbered topic-specific reports, many special reports and recommendations to the parties, and numerous other analyses.

The Court appreciates the efforts of the United States to bring STS into compliance since the mid-1980s.  The Court expects the United States will continue to monitor the welfare of the residents of Southbury Training School well beyond the period of active judicial oversight.

Defendants are commended for the tremendous improvements they undertook in the years since this Court found them in contempt of the Remedial Orders.  The dramatic turnaround at STS required commitment, dedicated resources and extraordinary systemic changes

---

[9]The consultant noted that 75% of the population at STS is classified in the severe or profound range of disability.

documented in the record.  The contempt finding has resulted in the reform of Southbury Training School mandated in the Remedial Plan and its associated plans and orders.  The remedial process has done much to advance the interests of the residents of Southbury Training School.  Ten years ago, this Court found systemic flaws at STS which placed residents at risk of great harm, even death.  Today, residents of STS are safer and benefit from a state-of-the-art model of institutional care as Defendants have met the "adequate care" requirements in the Remedial Plan and, in many instances, gone beyond the court-mandated requirements to provide "best practices."

For the above reasons, it is hereby ORDERED:

1. The purposes of the Remedial Orders having been effectuated, Defendants are purged of the contempt adjudicated by the Court on June 19, 1996.
2. Defendants are released from active judicial oversight of all requirements in the Remedial Plan and its associated orders.
3. The Court Requirements in the Remedial Plan will continue as an injunction, the Consent Decree and Remedial Orders will remain in effect, and this Court will retain jurisdiction until the judgment is discharged.

4.   The obligations of Special Master David Ferleger under the July 30, 1997 Order of Reference are concluded, except that, within 45 days, he shall finalize any administrative details and billing for his and consultants' fees and expenses.[10]

SO ORDERED.

_____
ELLEN BREE BURNS, SENIOR JUDGE
UNITED STATES DISTRICT COURT

Dated at New Haven, Connecticut, this _____ day of March, 2006.

_____

[10] If the balance in the Registry is insufficient to cover these final costs, defendants shall make sufficient deposits to the Registry to that end consistent with the Court's Order of February 16, 2006 [Doc. No. 1385], modifying the Order of Reference and the Order of August 26, 2005.

13